## McCONKEY v. PEACH BOTTOM SLATE CO.

(Circuit Court of Appeals, Fourth Circuit. May 28, 1895.)

No. 111.

CONTRACTS—ASSENT.

Plaintiff, in February, 1889, received from defendant corporation an option to purchase its real estate and other property, which was extended from time to time, but not acted on. On April 19, 1890, plaintiff received from defendant a new agreement, in consideration of $2,000 already paid, and $5,000 to be paid in 30 days, to sell to him defendant's property at any time within 6 months from April 7, 1890, at the price previously agreed on, of which the $7,000 was to form a part. It was the understanding of the parties that, if plaintiff did not take the property within the 6 months, the $7,000 should be forfeited. Within the 6 months plaintiff verbally notified defendant that he had arranged to procure the necessary capital, and would be ready to take the property, but before the expiration of the time some of the capitalists interested withdrew, and plaintiff was unable to, and did not, take the property or give a binding acceptance of the option. The option was not renewed, but plaintiff continued his efforts to obtain capital to buy the property, and was aided and encouraged to do so by the officers of defendant, until July, 1892, when plaintiff had secured the necessary capital, but a difference had arisen between plaintiff and defendant as to the forfeiture of the $7,000, and plaintiff made no offer on the precise terms of the option of April 19, 1890, until September 13, 1892, when it was declined. *Held*, that the defendant was not bound, after the expiration of the option, to sell the property to plaintiff, and that no binding contract between the parties ever came into existence.

In Error to the Circuit Court of the United States for the District of Maryland.

This was an action by Charles R. McConkey against the Peach Bottom Slate Company to recover $7,000, alleged to have been paid under a contract broken by the defendant. The circuit court gave judgment for the defendant. Plaintiff brings error. Affirmed.

Alfred S. Niles and Oscar Wolff, for plaintiff in error.

H. Arthur Stump and James P. Gorter, for defendant in error.

Before GOFF and SIMONTON, Circuit Judges, and SEYMOUR, District Judge.

GOFF, Circuit Judge. The plaintiff below, a citizen of the state of Pennsylvania, sued in assumpsit, in the circuit court of the United States for the district of Maryland, the defendant, a corporation and citizen of the state of Maryland. In his bill of particulars filed with his declaration, which contains the common counts only, the plaintiff claims from the defendant the sum of $7,000, money paid by plaintiff to defendant on account of contract to purchase the property of defendant, situate in Harford county, Md., which contract, it was claimed, had been broken and rescinded by the defendant. The general issue and the statute of limitations were pleaded by defendant. The case was tried to a jury, which, under the direction of the court, at the close of the evidence, returned a verdict for defendant. The plaintiff thereupon prayed for this writ of error, assigning as error the refusal of the court below to give certain instructions asked for by the plaintiff, and the direction by the court that the jury return a verdict for defendant.

The testimony tended to show the following facts: That negotiations were entered into by plaintiff and defendant for the sale and purchase of defendant's property. That on February 15, 1889, a paper was executed which was as follows:

"Memorandum of a proposal of sale made this fifteenth day of February, in the year eighteen hundred and eighty-nine, by the Peach Bottom Slate Company, of Harford county, Maryland, to Charles R. McConkey. The said the Peach Bottom Slate Company, of Harford county, in consideration of the sum of sixty-five thousand dollars ($65,000.00), hereby agrees to sell to the said Charles R. McConkey, or his assigns, all the real estate now held by said company, together with the improvements, fixtures, machinery, and tools now located thereon or used in connection with the business of said company; payments to be made as follows: Thirty-five thousand dollars ($35,000.00) in cash upon the delivery of a good and sufficient deed for said property, and thirty thousand dollars ($30,000.00) within five years thereafter, with interest at five per cent., payable semiannually; the credit payment to be secured by mortgage on the property so sold. And the said corporation further agrees that at the time of the delivery of said deed the holders of the stock of said corporation shall deliver to said McConkey or his assigns all the capital stock thereof, to wit, one thousand shares of the par value of one hundred dollars each, amounting to one hundred thousand dollars, saving and reserving to said shareholders all the slate then on the bank, and all the debts due said company; said stockholders to pay all existing liabilities of said corporation. This offer to remain open for acceptance by said McConkey or his assigns until April 15th, in the year 1889, and unless accepted before said date shall be utterly null and void. In testimony whereof, the president of the said the Peach Bottom Slate Company, of Harford county, has hereto set his hand and affixed its corporate seal duly attested by the secretary thereof the day and year above written.

"[Seal.]                                    Richard Rees, Pres't.
                                            "John Humphrey, Sect'y.

"For and in consideration of one dollar, paid by Charles R. McConkey, the receipt of which is hereby acknowledged, the Peach Bottom Slate Company, of Harford county, hereby agrees to extend the time for acceptance of the foregoing offer from April 15th to May 15th, 1889. In testimony whereof the president of the said the Peach Bottom Slate Company, of Harford county, has hereto set his hand and affixed its corporate seal, duly attested by its secretary, this eighteenth day of March, A. D. 1889.

"[Seal.]                                    Richard Rees, Pres't.
                                            "John Humphrey, Sect'y.

"And, further, for and in consideration of one dollar paid by Charles R. McConkey, the receipt of which is hereby acknowledged, the Peach Bottom Slate Company, of Harford county, hereby agrees to extend the time for acceptance of the foregoing offer by said Charles R. McConkey or his heirs and assigns until December 20th, 1889, and unless accepted before that time shall be utterly null and void. In testimony whereof the president of the said the Peach Bottom Slate Company has hereto set his hand and affixed its corporate seal, duly attested by the secretary thereof, this 14th day of October, 1889.

"Richard Rees, President.
"John Humphrey, Sect'y.

"And, further, for and in consideration of one dollar paid by said Charles R. McConkey, the receipt of which is hereby acknowledged, the Peach Bottom Slate Company, of Harford county, hereby agrees to extend the time for acceptance of the foregoing offer by said Charles R. McConkey or his heirs and assigns, until February the 6th, 1890, and unless accepted before said time shall be utterly null and void. In testimony whereof the president of the said the Peach Bottom Slate Company, of Harford county, has hereto set his hand and affixed its corporate seal, duly attested by the secretary thereof, this 21st day of December, 1889.

"[Seal.]                                    Richard Rees, President.
                                            "John Humphrey, Secretary."

—That plaintiff was to secure other parties to furnish all or part of the purchase money mentioned in said option, and was to receive a commission of 5 per cent. if the sale was made under it. That before February 15, 1889, plaintiff had secured an option upon a certain piece of land called the "Coleman Tract" (adjacent to the defendant's property, the slate vein then being worked by defendant extending into said Coleman land), the same being in the following words, viz.:

"Lebanon, Pa., December 17, 1888.

"Mr. Charles R. McConkey, Peach Bottom, Pa.—Dear Sir: Confirming conversation of last week, I agree to sell to you or your assigns our Harford county slate tract for eleven thousand seven hundred dollars ($11,700.00). This offer to remain open until June 1st, 1889, after which date it becomes void.
"Yours, truly, Robt. H. Coleman."

—That plaintiff, after securing these options, endeavored to interest people in the same, and to raise the money required to pay for them so that they could be worked together. That defendant's option was renewed from time to time until February 6, 1890, without being accepted. That in the fall of 1889 the agreement as to commissions was changed so that plaintiff was to have $5,000 as commissions, provided he raised the money and took the property. That on February 8, 1890, the following paper was executed, viz.:

"Received, Delta, Pa., February 8th, 1890, from Charles R. McConkey one thousand dollars on account of the purchase money to be paid under an agreement between the Peach Bottom Slate Company, of Harford county, and the said McConkey, bearing date February 15th, 1889, and upon the payment of one thousand dollars additional, on or before February 20th, inst., and the balance of the cash payment specified in said agreement on or before April 7th, 1890, and have the credit payment fully secured, as specified in said agreement, the Peach Bottom Slate Company, of Harford county, hereby agrees to sell, transfer, and deliver to said McConkey or his assigns all the real estate held by said company, with the improvements, fixtures, machinery, and tools located thereon, together with the capital stock thereof, to wit: one thousand shares of the par value of one hundred dollars each, amounting to one hundred thousand dollars, according to the terms of said agreement. In the event of said McConkey or his assigns failing to make payments as aforesaid, then the Peach Bottom Slate Company, of Harford county, reserves the right to declare the payments already made forfeited to it, and this agreement null and void. In testimony whereof the president of the said the Peach Bottom Slate Company, of Harford county, has hereto set his hand and affixed its corporate seal, attested by the secretary thereof the date above written. 
"[Seal.] Richard Rees, President.
"John Humphrey, Secretary.

"Delta, Pa., Feby. 8th, 1890.
"Received from Charles R. McConkey one thousand dollars, as above stated.
"$1,000. John Humphrey, Treas."

—That the second payment called for was paid, and following receipt given, viz.:

"Delta, Pa., Feby. 20th, 1890.
"Received from Charles R. McConkey one thousand dollars for second payment as stated in the foregoing agreement.
"$1,000. John Humphrey, Treas."

—That the $2,000 mentioned in said receipts was actually paid on the dates specified. That about 12 days after that option had expired the following agreement was entered into:

"'This agreement, made and concluded by and between the Peach Bottom Slate Company, of Harford county, Maryland, hereinafter called the party of the first part, and Charles R. McConkey, of York county, Pennsylvania, hereinafter called party of the second part, witnesseth: That the said party of the first part, for and in consideration of the sum of two thousand dollars in hand paid, by the said party of the second part, at or before the execution hereof, the receipt whereof is hereby acknowledged, does hereby grant to said party of the second part, his heirs and assigns, an option for six months, from and after the seventh day of April, A. D. 1890, to purchase all the real estate now held by said company in Harford county, Maryland, together with the improvements, fixtures, machinery, and tools now located thereon, or used in connection with the business of said company, under the name of the 'Peach Bottom Slate Company of Harford county.' And the party of the second part does hereby agree to pay to the party of the first part hereto the further sum of five thousand dollars, within one month from the 7th day of April, A. D. 1890. And the said party of the first part does further covenant and agree by these presents that in case the said party of the second part does within the said time of six months from and after the 7th day of April, A. D. 1890, exercise his right of option, and agree to take and accept the said land and property, then upon the further payment of the sum of twenty-eight thousand dollars ($28,000.00) lawful money to be paid upon the execution and delivery of the conveyance hereinafter mentioned, the said party of the first part does hereby, for itself, its successors and assigns, covenant and agree to grant and convey to the said party of the second part, his heirs and assigns, the said described land and property, when requested so to do, and shall deliver a proper, good, and sufficient deed in fee simple therefor, and upon the delivery of said deed, the party of the second part hereby agrees to make, execute, and deliver, or cause to be made, executed, and delivered, to the party of the first part hereto, a first mortgage on said property, in the sum of thirty thousand dollars ($30,000.00), payable within five years from the date thereof, with interest on said sum at the rate of five per centum per annum, payable semiannually, with the right to anticipate all or any part of said thirty thousand dollars, which shall be duly credited on said mortgage; the said land and property to be free from all incumbrances when conveyed by the party of the first part hereto, and title thereto to be good and merchantable and of record, and the examination of title and the preparation of deed to be made by the said party of the second part, and to be prosecuted with due diligence from and after his determination to take and accept the said land and property. Witness the hands and seals of the parties hereto, dated this 19th day of April, A. D. 1890.

"[Seal.]　　　　The Peach Bottom Slate Company, of Harford County
　　　　　　　　　　　　"By Richard Rees, Pres.
　　　　　　"Charles R. McConkey. [Seal.]
"Attest:
　　"John Humphrey, Secty.
"Witnesses:
　　"M. H. Houseman.
　　"W. F. Walworth."

----That the two previous payments were accepted as part of the consideration mentioned in that agreement, and that nothing was said at that time about forfeiting said payments, but that they were considered as payments on the purchase money. That nearly a week subsequently to April 19th, plaintiff, at the request of Mr. Humphrey, the secretary of the company, wrote and signed the following paper:

　　　　　　　　　　　　　　　　"Delta, Pa., April 19, 1890.

"To Whom it may Concern: I do hereby declare and affirm that in the matter of a certain agreement this day concluded between the Peach Bottom Slate Company, of Harford county, as party of the first, and myself as party of the second, part, it is fully understood, and I hereby consent, that in the event of

the failure to avail myself of the option to purchase the property on the 7th day of October, 1890, as therein agreed, all payments made prior to said 7th day of October, 1890, shall be forfeited to the said Peach Bottom Slate Company, of Harford county, Maryland.                          Chas. R. McConkey."

—That the $5,000 payment was made May 7, 1890, as appears by the following receipt, the draft mentioned therein being paid in due course:

"Received, Delta, Pa., May 7th, 1890, from Chas. R. McConkey, a draft on W. F. Walworth, of Cleveland, Ohio, for five thousand dollars, which, when paid, will be in full for payment of this date as per agreement of April 19th ult.
"$5,000.               John Humphrey, Treas. Peach Bottom S. Co. of H. Co."

—That under the agreement of April 19, 1890, plaintiff continued his efforts to obtain the balance of the purchase money, and some time in June or July, 1890, he notified Mr. Rees, the defendant's president, and Mr. Humphrey, its secretary, that he had succeeded in getting people to subscribe the necessary money to the stock of a corporation which was to be formed and organized for the purpose of buying and operating the defendant's property and the Coleman tract, and that he would be ready to take the property. That he then employed an attorney to examine the title to the property, and that subsequently the defendant and its stockholders executed a deed for its property, mentioned in the option, conveying the same to the plaintiff on the terms therein stated, but that such deed was never delivered. That about the time such deed was ready, plaintiff told defendant's president that some of the parties who were to have joined him in the purchase had dropped out, and the matter would be delayed somewhat, but that he would go to work and get others, to which said president replied: "Go to work and get others." That plaintiff endeavored to get others to take the place of the parties who had dropped out, and continued so to do to the knowledge of defendant's officers until July, 1892. That in the spring of 1891 plaintiff prepared a prospectus, of which there were several copies, one of which he showed to defendant's president, and that it read as follows:

"The Old Peach Bottom Slate Company, of Harford county, a corporation, chartered in Maryland, with an authorized capital of $150,000, has secured 77 acres of valuable slate lands in Harford county, Maryland, containing very extensive deposits of slate, from which are made the celebrated 'Peach Bottom Roofing Slates,' in quality unexcelled by any in the world. The lands are located on the line of the Baltimore & Lehigh Railroad, near the borough of Delta, Pa., about half way between the cities of Baltimore and York. There is a quarry in successful operation, with a good equipment of machinery, producing five thousand squares of roofing slate annually, which can be increased to from thirty to fifty thousand squares, if desired, and operated for many years without exhausting the supply. An increase of the product to only three times its present proportions will enable the company to pay large dividends on its capital stock, from the profit in the manufacture. The properties cost $77,000, of which there may remain for five years at five per cent. interest $30,000; requiring to pay for lands $47,000. It is proposed to secure a full paid capital, $75,000, of which, after payment of lands, $47,000, there will remain $28,000, for additional machinery and working capital for an enlarged operation. About two-thirds of the capital stock has been subscribed by parties in the neighborhood in blocks of from one to ten thousand dollars

each. The subscribers to the stock have the greatest confidence in the success of the company, and cheerfully recommend it to the consideration of those desiring a profitable investment, believing that an examination of the properties will more than confirm any statement made concerning it."

—That the Old Peach Bottom Slate Company, of Harford county, referred to in the prospectus, was a corporation formed practically by plaintiff some time in 1890 to take this property of the defendant and the Coleman tract and operate the two properties. That the $77,000 mentioned as the cost of the two properties in the prospectus, was made up of $65,000 to be paid for defendant's property and $11,700 to be paid for the Coleman tract. That the reason why plaintiff made the cost of the Coleman property $12,000 was that "when I first presented the matter and told them the cost of the Coleman tract was $11,700, every one said, "we will call it $12,000 in round numbers," so plaintiff put it at $12,000 in the prospectus to make it an even sum, but explained to nearly every one that the property cost "nearly $77,000." That this prospectus was shown to the president of the defendant some months after the deed had been prepared, and that said president knew what properties were included in the $77,000. That plaintiff, in the spring of 1891, and later, had negotiations known to the officers of the defendant with various parties looking to getting money to complete the purchase and payment of the balance of the money. That he kept the president and secretary of defendant advised as to whom he had interested in the matter, and took, at various times, parties of gentlemen to the quarries. That the president of defendant always went around and showed these gentlemen the properties, and explained what the resources of them were. That Mr. Hill, of Baltimore, came up in February, 1891, and the president of the defendant met him and showed him through the quarries and over the Coleman tract. That in April or May, 1891, several parties came up with the same object with Thomas A. Hays. That shortly after May, 1891, the railroad facilities were poor, and plaintiff said to the president of defendant that he thought "we had better defer further efforts until the railroad company got into better shape; for the reason that if any parties were brought there the first question would be, 'What are the facilities for transportation?'" That the defendant's president agreed with plaintiff that it would be better to suspend operations for the present. That this condition of things continued until winter came on. That winter is a very unfavorable time to show anyone the slate property, and no further effort was made until the spring of 1892. Then plaintiff resumed efforts. That the president of the defendant knew that plaintiff was working to get any one interested that he could. That in the fall of 1891 plaintiff received letters from Mr. D. P. Jones in regard to furnishing money to make up the balance of the $77,000 mentioned in the prospectus above set forth, to be paid for defendant's property and the Coleman tract, and that plaintiff showed the letters to the president of the defendant. That in the spring of 1892 plaintiff negotiated with Senator Baker, and with a party in Philadelphia. That the president of the defendant knew of these negotiations. That in addition

to the negotiations spoken of, which were known to the officers of the defendant, plaintiff saw Governor Jackson, of Maryland, in February, 1891. That about that time he had an interview with Mr. Rose, of Harrisburg. That he met a number of gentlemen in Philadelphia and New York. That he went to Newport and Providence, R. I. That he made several trips to Pittsburg, several to Philadelphia, several to New York, and a number to Baltimore. That, in fact, during what might be considered the proper season to work, after October 7, 1890, to July 15, 1892, there was not an interval of two weeks that he was not away seeing somebody in reference to these negotiations. That plaintiff spent his time and about $800 by way of expenses in conducting the said negotiations. That these efforts of the plaintiff to secure the balance of the purchase money were practically continuous down to July 15, 1892, when they were successful. That about June 20, 1892, plaintiff received a letter from Mr. Coleman in which Mr. Coleman said that he had a cash offer for the Coleman tract, and, unless plaintiff could dispose of it very soon, he would have to withdraw his option. Plaintiff showed this letter to the president of defendant and said: "If this Coleman property passes out of my control, it will be impossible for me to get the people to take your property, because the Coleman property is a very important feature of the transaction." And plaintiff further said to the president of the defendant that he had his party, he thought, ready to take defendant's property, but that it would require a few days, and plaintiff asked the president of the defendant that defendant should take the Coleman property, and hold it until plaintiff was ready to take the whole thing off its hands, and plaintiff would then take the Coleman tract off defendant's hands, together with the defendant's property. That this proposition seemed to strike the president of the defendant favorably. That the same proposition was communicated to the secretary of the defendant, and seemed to strike him favorably. That the same proposition was submitted to Col. Webster and Mr. Harlan, two directors of the defendant, Col. Webster being also a large stockholder, and Mr. Harlan being its counsel, and was finally accepted by defendant. And that the purchase of the Coleman tract was soon after made by defendant, at plaintiff's request, to enable plaintiff to get the balance of the purchase money for defendant's land, and then take the Coleman tract, together with the defendant's property, off defendant's hands. That the option under which the Coleman tract was finally purchased is the option above mentioned, continued sometimes in writing and sometimes verbally, and that plaintiff never paid Mr. Coleman anything for it. That a few days after the purchase of the Coleman property by the defendant, plaintiff met secretary of the defendant, who showed him a letter from Col. Webster asking him to come to Bel Air to see him. That plaintiff asked, "Were you down?" That the secretary of the defendant answered, "Yes." That plaintiff said, "What did you do?" That the secretary of the defendant replied: "Well, we want you to have the property, but we have an offer from another party, and we don't want to lose the sale of it. We want you to hurry up." That plaintiff therefore renewed his efforts, and

saw Mr. Smith of Wilkesbarre, who agreed to take the property, with others, on July 15th. That on the 4th of July, plaintiff had an interview with Mr. Harlan, counsel for defendant, Mr. Rees, its president, and Mr. Humphrey, its secretary, and talked over the matter of the property. The plaintiff then, in response to the following questions, gave the following answers:

"Q. State what occurred. A. They came in there from a meeting which they had at Mr. Rees' house. Q. Came in where? A. Came to the bank. Q. At Delta? A. Yes, sir. Q. Where you were? A. Where I was at their invitation. I received word Mr. Harlan was coming up and desired to meet me on the 4th of July, and they came in there and talked this matter over. Q. What matter? A. The matter of the property,—paying the balance of the purchase money. I told them that I thought I could get the money by the 15th of July, and they gave me to the 15th of July to consummate it. Q. Was anything else said? A. Mr. Harlan remarked, 'You are to get a commission of $5,000;' I said, 'Yes, a commission of $5,000 and the $7,000 which I have already paid you.' He said, 'Oh, that $7,000 was put in by speculators and lost.' I said, 'Why, you knock the wind out of me.' I just felt as if the wind was knocked out of me, because it was the first intimation I ever had there was to be any forfeiture. It had never been intimated in the slightest degree. Mr. Harlan reared himself up and said, 'Why, I am appalled to think you claim that $7,000.' The matter dropped then. We went away, and Mr. Harlan says, 'Well, we will pay you the $5,000 commission, but the $7,000 is a matter for further consideration.' With that they went out. That was the first intimation I had that they had any notion of asking the forfeiture of that money. Q. That was all that was said? A. That was all that was vital to the matter. Q. You say they gave you to the 15th to complete the contract and pay the balance of the purchase money? A. Yes, sir. Q. What happened, then, on the 15th? A. I wrote a letter accepting the properties, and had it served on Mr. Rees. Q. In the interview of July 4th, when you say you talked about the property, what property was it? A. It was the property of the Peach Bottom Slate Company, of Harford county, together with the Coleman property, which I expected to take off their hands at the price they had paid. Q. At your request? A. Yes, sir."

And on cross-examination, in answer to the following questions, plaintiff gave the following answers:

"Q. Now, Mr. McConkey, on the 4th of July, yesterday, you will remember you said that in the bank Mr. Harlan and Mr. Rees and Mr. Humphrey verbally extended your right, under the option of April 19th, from the 4th of July to the 15th of July; that is correct, isn't it? A. Yes, sir. Q. That is the option of the original Peach Bottom property? A. My understanding was this: that they extended the time for me to raise this money until the 15th of July; in other words, they gave me until that time to get it."

—That the letter served on the president of defendant by the plaintiff was as follows:

"July 15th, 1892.

"Mr. Richard Rees, President of the Peach Bottom Slate Company, of Harford County—Dear Sir: I hereby give you notice of my readiness to complete the purchase of the 'Slate Properties' and to enter into a mutually satisfactory arrangement as to the terms of payment of the balance of the purchase money, and the taking possession of the properties, to wit, the lands of the York & Peach Bottom Slate Co., of Harford Co., $65,000; the lands known as the "Coleman Tract," $11,700; subject to the following credits, to wit: Seven thousand ($7,000) dollars paid your company on account of the purchase money, and five thousand ($5,000) dollars to be paid me by your company as a commission for effecting the sale of the first-mentioned lands, leaving a balance of sixty-four thousand seven hundred ($64,700) dollars, thirty thousand ($30,000) dollars of which will be secured by mortgage on the first-mentioned

lands, payable in five years, with interest at the rate of five per cent. per annum, and the remainder, to wit, thirty-four thousand seven hundred ($34,700) dollars, to be paid in cash as aforesaid.

"Very respectfully, Chas. R. McConkey."

—That to that letter the following answer was received:

"Bel Air, Md., July 16, 1892.

"Charles R. McConkey, Esq., Delta, Pa.—Dear Sir: Your letter of yesterday to Mr. Rees, in reference to purchase of quarry property of the Peach Bottom Slate Co. has been handed to us. The company has no knowledge of any arrangement for the sale of the property upon the terms stated in your letter, and desires to negative most strongly the intimation of the existence of any such arrangement. If your letter is intended as a proposition for the purchase of the company's property, it cannot be entertained on account of the inadequacy of the price offered.

"Yours, very truly, Harlan & Webster.
"Att'ys for the Peach Bottom Slate Co."

—That this answer was received by plaintiff about July 16th. That about the 20th of July plaintiff's horse ran away with him, and he met with a very severe accident. That soon after his recovery from this accident plaintiff went to Mr. Stewart, his lawyer, in York, Pa., who prepared another letter, which plaintiff copied and sent, as follows:

"Delta, Pa., Sept. 13th, 1892.

"Mr. Richard Rees, Pres. the Peach Bottom Slate Co., of Harford Co., Md.— Dear Sir: Referring to my agreement, dated the 19th day of April, 1890, with your company to purchase all the real estate then held by your company in Harford Co., Md., and which has been kept up until the present time, I beg to say I am now prepared to take and accept the land and property therein mentioned in accordance with the terms of said agreement. You will please furnish me with the deeds and other papers necessary for an examination of the title and the preparation of the deed, and you will also have the property freed from all incumbrance, so that I may be able to obtain a title in accordance with the terms of said agreement. Your immediate reply and compliance will very much oblige me, as I desire to consummate the matter at once.

"Yours, truly, Chas. R. McConkey."

To that plaintiff received answer as follows:

"Bel Air, Md., Sept. 15, 1892.

"Charles R. McConkey, Esq., Delta, Pa.—Dear Sir: Your letter of 13th inst. to Mr. Rees, president of the Peach Bottom Slate Co., has been handed to us to answer. The company denies that your option of April, 1890, has been kept up, and further denies that any agreement is in force under which you have the right to purchase all or any part of its land.

"Yours, very truly, Harlan & Webster, Att'ys."

After that, plaintiff demanded the return of the money paid, by letter, as follows:

"Delta, Pa., September 24th, 1892.

"Richard Rees, Esq., President the Peach Bottom Slate Co., of Harford Co., Md.—Dear Sir: In view of the refusal of your company to perform its contract with me, as demanded in my letter of the 13th inst. to you, and refused by letter of Harlan & Webster, your counsel, in their letter of the 15th inst., I now demand the return of the amount of seven thousand ($7,000) dollars paid on account of said contract and the interest thereon from each of said payments, and also the remainder of five thousand ($5,000) dollars commission agreed to be paid me in said transaction, and on account of which I have received two payments aggregating five hundred and thirty-eight 47-100 ($538.47) dollars. Your prompt compliance will oblige,

"Very respectfully, Chas. R. McConkey."

To this plaintiff received answer as follows:

"Bel Air, Md., Sept. 27, 1892.

"Charles R. McConkey, Esq., Delta—Dear Sir: Your letter of 24th inst. to Richard Rees. Esq., president of the Peach Bottom Slate Co., of Harford Co., has been forwarded to us. The company still insists that it has no subsisting agreement of any kind with you and respectfully declines to comply with the demand made in your letter.

"Yours, truly,　　　　　　　　Harlan & Webster, Att'ys for Company."

—That then plaintiff referred the matters to his attorneys, who brought suit that fall; but the case failed by reason of lack of jurisdiction in the Pennsylvania courts, and a short time afterwards this suit was brought in Maryland.

Plaintiff further testified that the president of the defendant, in the spring of 1891, agreed to take $3,000 of the stock of the new company formed by plaintiff in order to help plaintiff raise balance of purchase money; that from February, 1889, to July, 1892, the quarries of the defendant were worked in about the same way they had been worked for years, as far as plaintiff could judge; that from October 7, 1890, to July 4, 1892, no one ever said anything to plaintiff about the forfeiture of the $7,000 paid.

"Q. Did ever anybody connected with the company ask you to hurry to get ready to complete your purchase? A. No, sir. Mr. Humphrey, secretary of defendant, either sent me or handed me in an envelope, a copy of a letter that he had received from Col. Webster, as follows:

"'Bel Air, Md., Oct. 11, 1890.

"'John Humphrey, Treas.—My Dear Sir: Mr. Walworth's letter to Mr. McConkey of 6th inst., a copy of which you kindly inclosed on 10th inst. in reference to contract for buying the quarry, is rather an unusual business communication. Of course we highly appreciate Mr. Walworth's good opinion that we are "fair-minded men," and "will accept the situation gracefully and gentlemanly," but we certainly would like to be informed what the situation is that we are expected to accept. We have made a contract to sell a certain valuable property upon terms clearly stated. Does Mr. Walworth propose to fulfill his contract, make his cash payment, now overdue, and take his deeds, and if so, when are we to expect the cash payments? I prefer that Mr. Walworth shall take the property, but must insist that he must be either "off or on" without further delay. I trust you will make no other agreement for delay without my consent, as you are aware the delays in payment heretofore granted have been against my judgment of what were sound business transactions. You are at liberty to show this letter to Mr. McConkey.

"'Yours, very truly,　　　　　　　　Edwin H. Webster.'

"My recollection is that Mr. Humphrey handed me the envelope containing the letter, and said, 'Here is a copy of a letter which I received from Col. Webster.' He said nothing more. He made no comments on it. I never heard it alluded to since. This was about two months before the deed was prepared by defendant. I saw Mr. Webster several times after that, possibly twice. I saw him in the latter part of February, 1891. He was returning from Baltimore. He had been down, he told me, to see Mr. Hill, a gentleman, of Baltimore, that I had had up there to look at the property some days previous. Mr. Webster told me he had missed seeing Mr. Hill. I told him I thought Mr. Hill was interested in the slate business, but he wished to satisfy himself about the profits of the business for the preceding five years, and that he had seen Mr. Humphrey, and the information he got from Mr. Humphrey was not satisfactory. The colonel said he thought he could make it clear to Mr. Hill that the company had made money, and that he would try to see him afterwards and have an interview with him on the subject. Q. Did he say anything about hurry then on your part? A. No, sir; not a word. Q. He knew Mr. Hill had gone up with you to look at the property with a view to going

in? A. Yes, sir; I told him that, and he knew it before. Q. And he never said anything to you then about hurry now or at any time after that? A. No, sir. Q. Was that the only intimation that they wanted you to hurry up, down to the 4th of July? A. That was the only intimation up to the time that I saw Mr. Humphrey, about June 29th."

Plaintiff further testified that he had a conversation with Mr. Rees in his office, in which Mr. Rees said that, so far as he was concerned, he was perfectly willing that plaintiff should have the property, but that he was overruled by others, mentioning "parties in Bel Air" and Mr. Benjamin Williams. That the secretary of the company told plaintiff that he was perfectly willing plaintiff should have the property, and that when plaintiff met Mr. Williams plaintiff said, "Ben, Mr. Rees tells me that you objected to my having that property," and Mr. Williams replied, "Why, I never made any objection." Plaintiff further proved by Mr. William T. Smith, a competent witness, that he is and was, in 1892, a resident of Wilkesbarre, Pa. That he agreed with Mr. McConkey to furnish all the money necessary to complete the payment of the money due defendant on account of plaintiff's purchase of its property, and that on July 15, 1892, he had the money ready in bank. That he would have furnished all the money necessary to pay for both defendant's tract and the Coleman tract, or if the plaintiff could not get the Coleman tract he had the money ready which was necessary to pay the balance on the defendant's tract, and would have furnished it for that purpose. That he understood that plaintiff was to have an interest in the company to be formed to work the quarry, and that some parties who lived near the plaintiff were to have an interest. He had also mentioned the matter to some friends of his own in Wilkesbarre who might also have taken an interest, but that he stood ready to take the balance of the stock, whatever it might be, and pay the balance of the price. Plaintiff further proved by Thomas Hill that he went up to defendant's quarry in January or February, 1891, at the instance of the plaintiff, to look at the land of the defendant and the tract of land adjoining, called the "Coleman Tract," with a view of furnishing a part of the money necessary to pay for the two tracts and operate the quarries; that he was met by the president of defendant and by Mr. Humphrey; that the president of defendant walked around with him, showed how the slate was gotten out, and the extent of the property, etc.; that later he called on Col. Webster to get further information, but failed to see him then; that in response to that call Col. Webster called upon him in the city, but did not find him in; that subsequently, however, he either saw Col. Webster or heard from him in regard to the profits of the concern. Plaintiff further proved by Thomas A. Hays, a competent witness, that at plaintiff's request he endeavored to interest parties to go in with plaintiff, with a view to building up a stock company to take and operate the quarries on defendant's land together with the Coleman tract; that on May 13, 1891, witness went to the quarries with Messrs. D. H. Rice, Alex. M. Fulford, and Alex. Bell; that on May 26, 1891, witness went with Messrs. John S. Hays and L. Z. Doll and Alex. M. Fulford;

that on June 22, 1891, witness went with Messrs. J. F. Griffith and Wm. J. T. Riley; that the president of the defendant met witness and his party on each trip and showed them through the whole manufacture of slate from beginning to end; that he knew why the parties had come up, and showed them around as if he were interested. Plaintiff further proved by Robert L. Jones, a competent witness, that he went with plaintiff in February, 1891, to see Governor Jackson to get him to take stock in the new company plaintiff was trying to organize; that after that witness spoke to the president of the defendant about the matter, and the president of the defendant said that he would take a certain number of shares, probably $3,000, and that Mr. Williams would take some; that the tracts which plaintiff proposed to operate with this new company were the tract owned by defendant and also the Coleman tract; that witness had a conversation with the president of defendant at defendant's quarry, and he thinks in the fall of 1891, after the president of defendant had signified his intention to take stock in the new company, and in that conversation the president of the defendant said, upon witness pointing out to him a good showing of slate, that he, defendant's president, was saving that for the new company, that in July, 1892, witness among others had agreed with plaintiff to furnish the balance of the purchase money and to take this property. Plaintiff was among the stockholders. Mr. Smith, of Wilkesbarre, was to furnish most of the money. That witness talked very often with the president of the defendant, but never heard of the negotiations between plaintiff and defendant being broken off, and never heard of plaintiff's money being forfeited, or any claim made by defendant's president that it was forfeited. Plaintiff further proved by Watson A. McLaughlin, a competent witness, that in the fall of 1891, Humphrey D. Humphrey, the manager at the quarry of defendant and one of its stockholders, told him that the defendant had sold the quarry and had received $7,000 on it in part payment from the plaintiff, and that they expected the new company might take it every day. Plaintiff also proved by the same witness that he had offered plaintiff $1,000 for his option on the Coleman tract, but that plaintiff had refused the offer. Plaintiff further proved by Stevenson A. Williams, a competent witness, that he is an attorney at law at Bel Air, Md.; that some time in the summer of 1890 he was employed to examine the title to defendant's property, and that he some months afterwards drew the deed before mentioned to plaintiff; that about the time of the execution of the deed witness examined the minutes of the defendant and found some fault with them, and Mr. Harlan then had them corrected; that witness never notified any one connected with the defendant that plaintiff had abandoned the tract and it was "off"; that plaintiff never said anything to him to that effect; that some time after the deed was executed, probably six months afterwards, witness remembered seeing Col. Webster and asking him what had become of the McConkey matter, and Webster had replied that "McConkey was still working at it, and he hoped he would get through,

that the company felt safe because they had $7,000 in hand, and they could forfeit that whenever they wanted to; that he did not give witness to understand at all that it had been forfeited.   On the contrary, witness understood that he was anxious for Mr. McConkey to succeed with it; quite anxious that he should succeed in organizing a company that could pay up the balance of the money.    Plaintiff then offered the minute book of the defendant and read therefrom the following minutes:

"Harford County, June 3rd, 1890.

"The board of directors met.  Present: Richard Rees, president; John Humphrey, secretary; Benjamin Williams; and Edwin H. Webster.  The president and secretary reported that they had, on April 19th, 1890, closed an option with Charles R. McConkey, of York county, for the sale of the whole slate quarry, fixtures, and machinery at and for the sum of $65,000.00,—for a consideration of $2,000.00 theretofore paid in cash, $5,000.00 to be paid within 30 days from April 7th, 1890; the option to stand for six months from said 7th April, 1890, within which time $28,000.00 additional is to be paid in cash, and upon a satisfactory deed being furnished by the company a mortgage for $30,000.00 is to be given for the balance of the purchase money to run 5 years, interest at 5 per cent., payable semiannually, with right to said McConkey or his assigns to anticipate the payment of any part thereof, and if said option is not availed of all payments made to be forfeited to the company.  And that the said McConkey has since paid the said sum of $5,000.00.  Upon motion of Edwin H. Webster the action of the president and secretary was ratified, and the president was directed to report the facts to the stockholders' meeting. The directors' meeting then adjourned.          Richard Rees, Prest.
                                                    "John Humphrey, Secretary."

  Extract from minute book:

"Harford County, June 3rd, 1890.

"The adjourned annual meeting of the stockholders of the Peach Bottom Slate Company, of Harford county, was held this day at the company's office at the quarries.  Benjamin Williams in the chair, and John Humphrey, secretary.  The secretary and treasurer submitted the annual statement of the affairs of the company, which was directed to be recorded.  The president reported that an option had been closed with Charles R. McConkey for the sale of the whole quarry, machinery, and tools, at $65,000.00 (all other assets of the company were reserved), said option to stand for six months from April 7, 1890, and that $7,000.00 had been paid on account, all payments to be forfeited if the option is not availed of as set out in the agreement which was read to the meeting.  Upon motion of Edwin H. Webster the action of the directors was ratified.  Upon motion, the stockholders' meeting was adjourned.
                                         "Benjamin Williams, Chairman.
                                         "John Humphrey, Secretary."

  Extract from minute book:

"Harford County, December 2nd, 1890.

"General stockholders' meeting of the Peach Bottom Slate Co., of Harford county, was held this day.  Mr. Webster then offered the following resolution, which was unanimously adopted: Resolved, that the sale of our slate quarry, its real estate and machinery thereon, as heretofore made by the board of directors to Charles R. McConkey, and according to the terms heretofore reported, be approved and ratified, and that the board of directors are hereby instructed to make a proper deed to said McConkey, upon his payment of the balance of the cash payment now due and the execution of a mortgage for the balance of the purchase money.  Upon motion of Edwin H. Webster, the stockholders' meeting adjourned until Tuesday, December 23rd, 1890.
                                                    "John Humphrey, Secretary."

  Plaintiff further proved that these were the only minutes in which the name of Mr. McConkey or the matter of any business transaction

in which he was interested were found. The defendant then offered evidence to support the issues on its part joined. Both plaintiff and defendant asked the court for certain instructions to the jury, which are set forth in the record, but which, in the view that we take of this case, it will not be necessary for us to consider.

Did the court below err in directing the jury to return a verdict for the defendant? We think that the contract of April 19, 1890, was an option for the sale of defendant's property, which gave the plaintiff six months from April 7, 1890, in which to complete the purchase on the terms therein set forth. All the agreements and the extensions thereof made prior to said contract by the parties thereto relative to the property mentioned therein were then null and void, and the new agreement of that date was entered into. By it the plaintiff was to pay $65,000 for the property, as follows: $2,000 in hand, $5,000 within one month from April 7, 1890, $28,000 upon the execution and delivery of the deed, and $30,000 to remain as a first mortgage on the property, but with the understanding that the $2,000, which had been paid under former contracts, and the $5,000 then provided for, were to be considered as payments for the privilege of the option, that were to be forfeited to the defendant in case the plaintiff failed to avail himself of the option to purchase by the time mentioned in said agreement. That this was the understanding between the parties to the contract is clearly shown by the papers signed by the plaintiff of the same date as the option, but shown by the testimony to have been executed a few days later. It was under this contract the money was paid by plaintiff, and for the violation of which by defendant he claims the right to recover in this action. The plaintiff, before October, 1890, did verbally notify the defendant that he would be ready to take the property, but he took no step that would bind him to do so, and the matter still remained optional with him. He had the title examined and the deed prepared, which was duly executed by defendant and ready for delivery in December, 1890. The defendant's stockholders duly ratified the contract of sale and directed the deed to be delivered upon the payment of the balance of the cash payment and the execution of a mortgage for the balance of the purchase money. But the plaintiff at this time was unable to comply with the terms of his contract for the reason that "some of the parties who were to go in * * * had dropped out." Certainly the defendant to that time had done everything that it was required by the agreement to do, and it was then ready to deliver the deed, and would have done so but for the plaintiff's failure to pay the purchase money then due. It is insisted that the defendant extended the time in which the plaintiff could purchase the property. How was such extension made? Certainly not by written agreement nor by any verbal arrangement that was to remain in force for any definite time. The plaintiff claims that when he notified the defendant that he would be ready to take the property the effect was to create a contract of sale, which was recognized by defendant and admitted by its stockholders in general meeting, as shown by the minutes thereof, which, it is said, also satisfy the requirements of the statute

of frauds. We do not find that the facts justify such a conclusion. The plaintiff at no time contracted to take the property. He did not agree to avail himself of the option by the notification he made, unless the parties with whom he was negotiating provided the money. If they dropped out he was to go with them. The fact that the defendant, acting by its officers, did encourage the plaintiff in his efforts to induce others to take the place of those who had withdrawn their subscriptions, and did assist him in his endeavors to consummate his scheme of purchase, while going to show defendant's willingness to sell and convey the property, after the expiration of the time limit fixed in the option, must not be construed as binding it in such a manner as to prevent it from withdrawing its indulgence at any time it saw proper, and treating the option as inoperative because of the plaintiff's failure to comply with it. By the plaintiff's own evidence it is shown that he was notified by defendant, considerably over one year after the deed had been executed, that the matter relating to the option and purchase must be closed, at which time he suggested the 15th day of July, 1892, as the day he would be ready, to which the defendant assented. It is plain that plaintiff did not tender himself ready on that day to take the property mentioned in the agreement of April 19, 1890, and it is equally clear that when he did (on the 13th day of September, 1892) tender himself ready to take it the defendant was under no obligation to convey the property to him. On this point the court below, in charging the jury, used the following language, which we quote approvingly as applicable to this case:

"The defendant replied that there was not any agreement then in force. It may be admitted that in an ordinary contract of purchase and sale, in which seven thousand dollars had been paid on account of a purchase amounting to sixty-five thousand dollars, that under these circumstances, which the plaintiff's evidence tends to prove, the money paid on account of such a contract could be recovered back. But this is not an ordinary contract, for by its express terms the seven thousand dollars was forfeited when the plaintiff failed to complete his purchase in December, 1890. The only meaning of the words 'to avail himself of his option to purchase the property,' must be to pay for it according to the stipulation as to the terms of payment reasonably construed. The reasonable time for payment expired when the deed was ready in December, 1890, and after that he was entitled to further time only by the indulgence of the defendant, an indulgence which could be withdrawn, and which I think must be held to have been withdrawn by the notice that the transaction must be closed by July 15th."

We conclude that, on the facts in evidence and the law applicable to them, it was proper for the court to direct the jury to return the verdict it did. It is not necessary that we consider the instructions tendered and refused other than as they have been disposed of by the conclusion just announced. The judgment of the court below is affirmed.